UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEO M. ABBY,

        Petitioner,

                               CASE NO. 2:08-CV-15333
  v.                           JUDGE DAVID M. LAWSON
                               MAGISTRATE JUDGE PAUL J. KOMIVES

JOHN PRELESNIK,

        Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION ................................................................ 2
II.   REPORT ............................................................................. 2
    A.    *Procedural History* ...................................................... 2
    B.    *Factual Background Underlying Petitioner's Conviction* ................................. 6
    C.    *Standard of Review* ...................................................... 14
    D.    *Sufficiency of the Evidence Claims (Claims I, V & IX)* ................................. 16
         1.    *Clearly Established Law* ...................................... 16
         2.    *Analysis* ................................................ 17
    E.    *Evidentiary Claim (Claims IV & IX)* ............................................ 21
         1.    *Clearly Established Law* ...................................... 21
         2.    *Analysis* ................................................ 22
             a. Drug Trafficking and Gun Testimony (Claim IV) ........................... 22
             b. Hearsay Testimony ...................................... 23
             c. Corpus Delecti Rule (Claim IX) ................................ 28
    F.    *Instructional Error (Claims II & III)* .......................................... 30
         1.    *Clearly Established Law* ...................................... 30
         2.    *Denial of Intervening Cause Instruction (Claim II)* ...................... 31
         3.    *Aiding and Abetting Instruction (Claim III)* ......................... 32
    G.    *Prosecutorial Misconduct (Claims V & VI)* ...................................... 33
         1.    *Clearly Established Law* ...................................... 33
         2.    *Analysis* ................................................ 33
             a. Misrepresentation of the Evidence ................................. 33
             b. Comment on Petitioner's Silence ................................. 35
             c. Shifting of Burden of Proof .................................. 37
             d. Arguing Gun Evidence and Aiding and Abetting Theory ...................... 37
             e. Appeal to Civic Duty .................................... 38
             f. Referencing Petitioner's Economic Status ............................ 39
    H.    *Counsel Claims (Claims VII & VIII)* ........................................ 39
         1.    *Denial of Counsel (Claim VIII)* ................................ 39
             a. Clearly Established Law .................................. 40

---

[1]By Order entered this date, John Prelesnik has been substituted in place of Barry D. Davis as the proper respondent in this action.

          b. Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
          c. Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
     2. *Ineffective Assistance (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
          a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
          b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
I. *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
     1. *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
     2. *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
J. *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
III. <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*  *  *  *  *

I.   <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should grant in part and deny in part a certificate of appealability.

II.   <u>REPORT</u>:

A.   *Procedural History*

     1.    Petitioner Leo Martinez Abby is a state prisoner, currently confined at the Handlon Correctional Facility in Ionia, Michigan.

     2.    On March 9, 2005, petitioner was convicted of second-degree murder, MICH. COMP. LAWS § 750.317, following a jury trial in the Saginaw County Circuit Court. On April 14, 2005, he was sentenced to a term of 40 to 60 years' imprisonment.

     3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

     I.    PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH THAT DEFENDANT MURDERED THE DECEASE[D.]

     II.    THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH THE CORPUS DELICTI OF THE CHARGE, IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHT TO BE CONVICTED ON SUFFICIENT EVIDENCE BEYOND A REASONABLE DOUBT.

     III.    THE TRIAL COURT REVERSIBLY ERR[ED] IN REFUSING TO GIVE

2

CJI.2D 16.15 INTERVENING CAUSE OF DEATH [INSTRUCTION] CONTRARY TO [THE] U[.]S[.] CONST[ITUTION].

IV.    THE TRIAL COURT REVERSIBLY ERR[ED] IN GIVING AN AIDING AND ABETTING INSTRUCTION WHERE THERE WAS NO EVIDENCE OF A PRINCIPAL THUS VIOLATING PETITIONER'S CONSTITUTIONAL DUE PROCESS RIGHTS TO HAVE A JURY MAKE A DETERMINATION ON ACTUAL EVIDENCE WHICH WAS . . . PROPERLY PRESENTED AT TRIAL.

V.    THE TRIAL COURT'S DECISION TO ALLOW INADMISSIBLE, IRRELEVANT EVIDENCE AND PROSECUTORIAL ARGUMENT THAT PETITIONER ENGAGED IN  DRUG TRAFFICKING VIOLATED PETITIONER'S FEDERAL AND STATE DUE PROCESS RIGHTS AND REQUIRES A NEW TRIAL PURSUANT TO [THE] U[.]S[.] CONSTITUTION[.]

VI.    THE RECORD IS DEVOID OF PROOF OF CAUSE OF DEATH[.] EVIDENCE AND PROSECUTORIAL ARGUMENT THAT PETITIONER HABITUALLY CARRIED A GUN AND SHOT DECEDENT VIOLATED PETITIONER'S FEDERAL AND STATE DUE PROCESS RIGHTS AND REQUIRES A NEW TRIAL[.]

VII.    THE PROSECUTOR'S [MIS]CONDUCT WAS SO EGREGIOUS THAT IT WHOLLY UNDERMINED THE FAIRNESS OF THE TRIAL, RENDER[ING] THE VERDICT UNRELIABLE, AND DEPRIV[ING] PETITIONER OF DUE PROCESS AND AN IMPARTIAL TRIAL BY JURY AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION.

VIII.    TRIAL COUNSEL WAS INEFFECTIVE THROUGHOUT TRIAL, DEPRIVING PETITIONER OF A DEFENSE IN VIOLATION OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHT[] TO COU[NS]EL AND TO PRESENT A COMPLETE AND EFFECTIVE DEFENSE.

IX.    PETITIONER WAS DEPRIVED OF COUNSEL AT BOTH TRIAL AND SENTENCING IN VIOLATION OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

X.    THE TRIAL COURT DID NOT PROPERLY RESOLVE PETITIONER'S CHALLENGES TO SENTENCING INFORMATION AT TRIAL.

XI.    PETITIONER SHOULD BE RESENTENCED BECAUSE THE SENTENCING COURT INCREASED THE STATUTORY SENTENCING

3

GUIDELINES RANGE BASED ON FACTS THAT WERE NEITHER FOUND BEYOND A REASONABLE DOUBT BY THE JURY NOR ADMITTED BY PETITIONER.

The court of appeals affirmed petitioner's conviction, but remanded for resentencing, concluding that the trial court had failed to properly resolve petitioner's challenges to the scoring of the sentencing guidelines. *See People v. Abby*, No. 262365 , 2007 WL 602562 (Mich. Ct. App. February 27, 2007) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Abby*, 480 Mich. 1003, 742 N.W.2d 359 (2007).

5.      On June 6, 2007, while petitioner's application for leave to appeal the initial decision of the court of appeals was pending in the Michigan Supreme Court, the trial court resentenced petitioner, imposing the same 40-60 year term of imprisonment it had initially imposed. Petitioner, through counsel, filed an appeal from the resentencing, raising a single claim:

WHETHER THE TRIAL COURT'S UPWARD DEPARTURE TO 480 MONTHS ON THE MINIMUM SENTENCE WAS WHOLLY UNJUSTIFIED BOTH ON THE FACT THAT THE TRIAL ERRED IN SCORING FIFTY POINTS FOR O.V. 7 WHICH INCREASED THE GUIDELINE RANGE UP FROM THE CORRECT RANGE OF 140-240 MONTHS AND FURTHER WHETHER THE TRIAL COURT COMPLIED WITH BABCOCK AND JACKSON IN MAKING ITS FINDINGS.

The court of appeals found no merit to petitioner's claim, and affirmed his sentence. *See People v. Abby*, No. 279498, 2009 WL 30454 (Mich. Ct. App. Jan. 6, 2009) (per curiam). It does not appear that petitioner sought leave to appeal this decision in the Michigan Supreme Court.

6.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 31, 2008, shortly before the Michigan Court of Appeals affirmed his sentence. As grounds for the writ of habeas corpus, he raises the following claims:

4

I.      PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE
        PROCESS BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO
        ESTABLISH THAT DEFENDANT MURDERED THE DECEASE[D.]

II.     THE TRIAL COURT REVERSIBLY ERR[ED] IN REFUSING TO GIVE
        CJI.2D 16.15 INTERVENING CAUSE OF DEATH [INSTRUCTION]
        CONTRARY TO [THE] U[.]S[.] CONST[ITUTION].

III.    THE TRIAL COURT REVERSIBLY ERR[ED] IN GIVING AN AIDING
        AND ABETTING INSTRUCTION WHERE THERE WAS NO EVIDENCE
        OF   A   PRINCIPAL   THUS   VIOLATING   PETITIONER'S
        CONSTITUTIONAL DUE PROCESS RIGHTS TO HAVE A JURY MAKE
        A   DETERMINATION   ON   ACTUAL   EVIDENCE   WHICH   WAS . . .
        PROPERLY PRESENTED AT TRIAL.

IV.     THE  TRIAL  COURT'S  DECISION  TO  ALLOW  INADMISSIBLE,
        IRRELEVANT EVIDENCE AND PROSECUTORIAL ARGUMENT THAT
        PETITIONER   ENGAGED   IN    DRUG   TRAFFIC[]ING   VIOLATE
        PETITIONER'S FEDERAL AND STATE DUE PROCESS RIGHTS AND
        REQUIRES   A   NEW   TRIAL   PURSUANT   TO   [THE]   U[.]S[.]
        CONSTITUTION[.]

V.      THE RECORD IS DEVOID OF PROOF OF CAUSE OF DEATH[.]
        EVIDENCE AND PROSECUTORIAL ARGUMENT THAT PETITIONER
        HABITUALLY CARRIED A GUN AND SHOT DECEDENT VIOLATED
        PETITIONER'S FEDERAL AND STATE DUE PROCESS RIGHTS AND
        REQUIRES A NEW TRIAL[.]

VI.     THE PROSECUTOR'S [MIS]CONDUCT WAS SO EGREGIOUS THAT IT
        WHOLLY   UNDERMINED   THE   FAIRNESS   OF   THE   TRIAL,
        RENDER[ING]   THE   VERDICT   UNRELIABLE,   AND   DEPRIV[ING]
        PETITIONER OF DUE PROCESS AND AN IMPARTIAL TRIAL BY JURY
        AS   GUARANTEED   BY   THE   FIFTH,   SIXTH,   AND   FOURTEENTH
        AMENDMENTS TO THE FEDERAL CONSTITUTION.

VII.    TRIAL  COUNSEL  WAS  INEFFECTIVE  THROUGHOUT  TRIAL,
        DEPRIVING PETITIONER OF A DEFENSE IN VIOLATION OF HIS
        FEDERAL AND STATE CONSTITUTIONAL RIGHT[] TO COU[NS]EL
        AND TO PRESENT A COMPLETE AND EFFECTIVE DEFENSE.

VIII.   PETITIONER WAS DEPRIVED OF COUNSEL AT BOTH TRIAL AND
        SENTENCING  IN  VIOLATION  OF  HIS  FEDERAL  AND  STATE
        CONSTITUTIONAL RIGHTS UNDER THE SIXTH AND FOURTEENTH
        AMENDMENTS.

IX.   THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH THE CORPUS DELICTI OF THE CHARGE, IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHT TO BE CONVICTED ON SUFFICIENT EVIDENCE BEYOND A REASONABLE DOUBT.

7.   Respondent filed his answer on September 25, 2009.  He contends that the majority of petitioner's claims are procedurally defaulted.  He further argues that all of petitioner's claims either are without merit or are not cognizable on habeas review.

B.   *Factual Background Underlying Petitioner's Conviction*

The factual background underlying petitioner's conviction was accurately summarized in the brief filed by petitioner's appointed counsel in the Michigan Court of Appeals:

> Defendant-Appellant (hereafter "Defendant") was charged and jury-convicted on one count of second degree murder on MCLA 750.31.  The trial concerned the killing of Calvin Tubbs or Calvin Little ("Bukie") on October 27, 2003.  The prosecution submitted that Defendant and the deceased were involved in drug dealing together.  The prosecution argued, additionally, that Defendant killed the deceased one morning and later sawed his body into pieces.  The torso was never found. Defendant was prosecuted based on circumstantial evidence stemming from the recovery of two arms and two legs in garbage bags . . . .
>
> **PROSECUTION EVIDENCE. Ernest Luera** testified on 10/27/03 he lived on 25th St. in Buena Vista.  On 11/4/03 he saw a man's leg on his lawn.  Sergeant Tim Jones testified that he was a patrol supervisor, K-9 supervisor and accident reconstructionist with the Flint Township Police Department.  He and his K-9 dog found two black plastic garbage bags at an embankment near the east side of 26th street at Roanoke, near a dead end.  Two additional bags were found about a hundred feet south of the first two bags.  The bags contained human remains.  **Officer Ruben Vasquez**, of the K-9 unit, testified that he went to two homes, one on Adams Street and one on Munson Court in Saginaw.  The dogs did not detect any body parts, or any scent of human flesh.  On re-direct he stated the head and torso were not found there. In opening statement, the prosecution stated that these two houses belonged to Defendant and these were the homes in which he resided.
>
> **Sandra Youn[c]k** testified that Calvin Tubbs, or "Bukie", the deceased, was her live-in boyfriend.  She knew Defendant because he had come over to their house one weekend day.  Defendant came to their home about once a week.  Since the apartment was small, Defendant and the deceased would go outside and stand on the porch.  She described the Defendant as "very respectable all the time."  Defendant often drove a Corvette when he visited them, On cross-examination, she said she had seen Defendant seven or eight times.  However, her statement was that she had seen him four or five times.

Ms. Younck's birthday was October 27, 2003. Bukie was to be at home when the witness arrived home from work by 3:30 on the 27th. That morning as she was getting ready for work someone knocked at their apartment. Bukie answered it; it was Defendant, who wanted Bukie to do some work for him. The deceased told Mark (Defendant) to come back and get him later; Mark said he would return at 10:30. Ms. Younck did not actually see Defendant when he allegedly came to the house, and she did not hear voices. She later called home at 10:30, and Bukie said that someone had just come to the door and he would call her back. He did not call her back; she telephoned the house again. Defendant answered the phone and handed it to Bukie. That was her last conversation with him.

When she arrived home, no one was there. She called Defendant on his cell phone and at his girlfriend's house. She could not reach Bukie and was not able to speak to him. The prosecutor asked, over objection, why she called Defendant first. She answered that he was last with Bukie. She also phoned Bukie's family members in Detroit, including "Uncle Fonz." Uncle Fonz was Bukie's uncle; she thought he was also related to Defendant. Over objection, she stated that Uncle Fonz told her she should call the police. She did speak with Defendant, also who told her "he never got a hold of Bukie."

Ms. Younk told jurors about her past cocaine use. She has two felony convictions for not bringing back her mother's car and for taking money from her brother-in-law. Ms. Younck admitted on cross-exam that she lied to police while in jail and told them she never saw the deceased using or selling drugs.

**Hilda Poncheitera**, Sandra Younck's mother, said that she saw Defendant's Corvette in the driveway of her home and heard voices upstairs on the morning of October 27, 2003. She lived in a duplex; her daughter lived upstairs and she lived on the lower level. She thought it was a little after 9:30 a.m., because a painter was supposed to arrive then. The Corvette was gone when the painter left at about 11:00 a.m. On re-direct and re-cross, she states that she did not see the Corvette again, but that she did not necessarily look out the window. **Steven Eimers** testified that he sold a Corvette to Defendant in late May or June, 2003.

**Lieutenant Kathleen Boyer** of the Michigan State Police Bridgeport crime lab testified as a fingerprint expert. She was at the crime scene on November 5 and took fingerprints from the garbage bags; ultimately matching the body parts [to] Calvin Tubbs, the deceased.

Lieutenant Boyer took the inner bags to test for fingerprints. The left and right hands and forearms were each bagged in three separate plastic bags, knotted at the tip. The middle bag of the left hand and forearm produced seven prints: two right thumbs, three left thumbs, a left index and left middle finger. The prints were identified as those of Defendant. Lieutenant Boyer also processed the outermost of the three bags containing the left arm of the deceased. This bag produced a thumb print which matched Defendant. Another plastic bag was also processed and produced one left thumb print belonging to Defendant. A knife and scissors with some "gravelly material" were also recovered. On cross-examination, Lieutenant Boyer stated that all of the bags which produced Defendant's prints were middle bags which did not touch the body parts. Further, she said that Defendant's Corvette and GMC pickup

did not produce any of the deceased's prints.

**Kanu Virani**, a forensic pathologist, examined two legs and two arms identified as the deceased's. The examination was on November 8, 2003. The right leg was severed slightly above the right knee, severed by a sharp object. The cut was smooth. Dr. Virani testified that the arms were also sharply cut. Dr. Virani testified that the cutting or dismemberment was done after death occurred for the decedent. He also could not determine a cause of death without the torso and the body, and could find no scientific proof as to how death happened. Dr. Virani did opine that "some kind of instrument which either is cutting back and forth or circulating like a power saw or a saw which you can use back and forth so that you can cut it in a sharp edge" but he did not say which kind of saw was used. However, the cuts were consistent with a jigsaw. Dr. Virani believed the death occurred at the end of October or beginning of November within a range of about 4-10 days.

The prosecutor asked Dr. Virani whether a battery-powered jigsaw marked as Exhibit 98 could have made the cuts. The witness stated that it cuts "the edge which is a hard edge. Again I remind you that you would not be able to cut the skin and muscles in the same way, so it must be cut by some different instrument, probably a knife or some type of sharp instrument.

Defense counsel cross-examined on whether a saw that is used to cut bone is different from a saw used to cut a tree, and the witness said it was. The doctor also stated that he did not specifically verify the weather conditions at the end of October or the beginning of November. Thus, the time of death was based only on loss of rigidity, which takes about three days, and before decomposition, which takes about eight to 10 days. Additionally, there was no blood in the bag with the body parts.

**Jerry Boose**, Defendant's brother, testified that on October 27th, 2003, at about 2 p.m., he had a call from Defendant as he drove in his car. Defendant was asking to borrow a saw to do some work. Defendant did not sound unusual or panicky; Defendant had borrowed tools many times in the past. Jerry Boose gave his consent. Later that day, between two and three in the afternoon, Defendant called back and said the saw did not work. He asked Jerry Boose to bring another one over, or go and buy one and he would pay him back. The witness said this was also not unusual. As they spoke, Mr. Boose thought he heard another male voice in the background. Again, he did not think it was unusual because the brothers own rental properties and frequently hire people to help them. Eventually, Defendant said he would take care of it himself. When he saw his brother the next day, Defendant told him he had left the saw in their father's garage. The witness stated that Defendant had also asked him to return a saw that he had borrowed from "Victor". The saw was returned to Victor a couple of days later.

Jerry Boose said he did not know the deceased. Around the 17th of November, Defendant was arrested. Jerry Boose spoke with police on or about December 1, 2003 and discussed the above events. Jerry Boose never learned who the other voice was because they got into a new conversation. **Denise Boose**, Jerry's wife, testified that on the last Monday of October, 2003, she was working at the store. Defendant came over and picked up a saw. He was acting normal. She later testified that she did not believe Defendant would or could be involved in a murder.

**Victor Hunter** testified that he was Defendant's cousin.  One day at the end of October, Defendant went to Mr. Hunter's house to borrow a saw in order to cut some tree limbs; Defendant was not acting strange in any way.  The witness identified a battery-powered saw as the one he had lent to Defendant.  He got the saw back when Jerry Boose told him it was at Jerry's store; he sent Tommy McCune over to get it.  On cross-examination this witness stated that Jerry told him he was going to the police.  Mr. Hunter initially did not want to be involved, but he later took the saw down to the station after police contacted him.  He carried the saw in a garbage bag but was impeached as to its color.  He testified that he told police that the saw had not been cleaned and there was not suspicious evidence with it.  **Tommy McCune** testified that he had picked up the saw from Jerry Boose's store; it had the blade missing.

Derrick Taylor testified that he was born and raised in Saginaw but that he lived outside of Detroit.  In response to prosecutorial questioning the witness also stated that Defendant told him he had retired from Dow [Dow Chemical].  The two talked about "making some business together" involving a lump sum which the witness thought was coming from Dow.  The prosecution asked, "(N)ow, you mention that the two of you had talked about business opportunities.  Did the defendant ever talk to you about any type of business relating to drugs?"  The prosecutor then asked what Defendant said to the witness about drugs.  The witness answered that they talked about "weed".  The prosecution asked where the Defendant was getting the marijuana [t]hat he was selling.  At this point there was an objection; it was sustained.  The prosecution asked again, and the witness said "actually Bukie had told me he was selling weed.  I didn't–."  The defense again objected and asked that this be stricken, and the objection was sustained.  Defendant never told Taylor that he was a marijuana dealer.  However, the witness said Defendant said he was thinking about selling cocaine.

Taylor testified that he said to Bukie, "you need to move your stuff because talking about stuff like that going to get somebody in trouble and then, you know, you going to have the police knocking at your door for nothing."  He further testified that when he talked to Defendant about it, the response was that "Bukie don't be knowing what he talking about."  The Defendant also assertedly [sic] told Taylor: "He say Bukie be around me so much or something to that to where he said, I can't cut him loose.  He knows so much about me."

In response to prosecutorial questioning, Taylor stated that Defendant told him that Bukie had almost gotten Defendant killed by "calling some people and told them that he had drugs and he said man, I ain't even tell them–that had nothing to do nothing like that."  This occurred about three or four weeks before October 27, 2003.  The prosecutor then asked more about cocaine dealing, specifically inquiring as to whether Defendant had further conversations about the cocaine business, did he come down and speak with Taylor about the cocaine business at his home.  The witness responded that they talked about Defendant's intention to go into the cocaine business at the witness's home for about 8-12 hours.

On October 27th, the witness was in Detroit and he had his regular morning phone call with Bukie.  Bukie said that Defendant was over at Bukie's house because

9

he wanted Bukie to wrap some pipes. The call was interrupted; Taylor called back 15 minutes later and got no answer. On . . . October 28th he did not hear from Bukie as he normally did, and he never received another call from the deceased.

Bukie's girlfriend phoned Taylor in the early hours of October 28th, 2003, to say that the deceased was not home. Over objection, the prosecutor questioned Taylor about what the girlfriend, Sandra Younck, said about getting a hold of Defendant regarding Bukie's whereabouts. Because she was crying, Taylor said he would talk to Defendant, who told Taylor that he went back to get Bukie to wrap some pipes but the deceased was not there. The next day Taylor started "having people look for him [Bukie]."

The Defendant called Taylor on the 29th or 30th. Defendant denied that Bukie had left the house with him on October 27th as Sandra Youn[c]k had reported. Defendant called back that same night and asked Taylor to "call that crazy bitch and tell her to quit saying he left with me because he didn't." Defendant's voice was "frustrated"; the "girl" was "the type of person that gossiped [] and he was just pissed off," Taylor testified.

Cross examination revealed that Defendant never specifically told Taylor that he was selling marijuana or cocaine. On re-direct, the prosecutor questioned Taylor about whether Defendant was asking his advice about various prices on marijuana and cocaine.

**Eugenia Hardy** testified, over objection, that she had had a conversation with Bukie, her cousin, in which he said he was going to "engage in this deal" with Defendant involving $50,000, which "he [Defendant] showed him." The conversation took place sometime in the beginning of October. The $50,000 was to be used to buy 100 pounds of marijuana. On cross-exam Ms. Hardy said Bukie had told her that he had done some 20-pound marijuana [deals] already.

**Victor Little** testified that he was Bukie's uncle. He stated that he was working with Bukie on one of Defendant's houses. Defendant pulled up and got out of the car; Defendant and Bukie hugged each other. The witness also testified that after Bukie disappeared, he called Defendant to find out where he dropped him off. Defendant stated that when he went by Bukie's, Bukie was taking a bath. When he went back, Bukie was gone: "So I said, well, Sandy's mother said she saw him leave with you. And he said, no, he said there was somebody else with me. And my thought was, if you knew you were coming back to pick Bukie up, why would you bring someone else with you when you were driving a Corvette? You know, Bukie was a big guy. There wouldn't have been any room for him." Mr. Abby did not seem unusual or strange during this conversation.

**Ryan Larrison** of the State Police Bridgeport Crime Laboratory was qualified as an expert in toolmark identification. He testified that he went to the morgue to look at the body parts after Dr. Virani examined them. He made a cast of the cut surfaces but could not determine characteristics and individual characteristics. He did determine the blade width. Where the cut went through, striations were characteristic of a straight-edge saw or hacksaw, which works in a back and forth reciprocating motion. The witness was shown Exhibit 98, a battery-driven Dewalt reciprocating saw. When asked whether this saw could have made the marks on the cut surface of

the deceased's bone, he said this could have. Larrison testified on cross-exam that he could not tell whether it was a metal blade or a wood blade that made the cuts. He also stated that "a rather large class" of saws could have made the cuts. He also said it could have been two blades. The witness stated that no examination of Exhibit 98 was actually done, and that he did not know whether the saw he used was the exact same model.

**Tani Watkins** testified that she worked at the Department of State Police Bridgeport Forensic Laboratory and was qualified as a witness in serology and trace evidence. She helped collect trace evidence on 26th Street where the body parts where found. There was gravel and soil in L9 which had a "musty sort of river bottom smell." She identified [numerous exhibits], as items found at the scene, including body parts, scissors, a knife, and muddy material. They were admitted.

Tani Watkins testified that she processed the Dewalt reciprocating saw that was submitted by Buena Vista Township Police Department. Near where the blade was housed, she found red/brown crusts, chalky debris, natural fibers, and a small portion of tissue that tested as human tissue. Ms. Watkins then testified that she took swabs from a .38 special revolver to find "contact DNA."

On cross-exam, she testified that there were three areas on the saw that she labeled. The third had a "chunk" of tissue the size of half a pencil eraser. She stated she did not attempt to obtain DNA from any part of the saw other than the blade, e.g., the trigger. Further, she stated[] that[,] although she found human blood on the scissors and knife, she could not tie the blood sample to this case through DNA.

The crawl spaces of the Defendant's two residences at 1307 Adams and "Munson" (Muson Court) were processed for evidence; soil samples were taken, also. They did not match other soil sample[s] taken. She also examined material taken from the deceased's fingernail which she sent for DNA testing. She took samples from the inside of the gun to be tested for DNA in case there was trace biological evidence, or "blowback" resulting from a shooting. Defendant's Corvette and GMC Silverado truck were processed for evidence for over four hours. Nothing was found which matched evidence of the crime. This included tape lifts from the bed of the truck, the seats and the floors of the vehicles. A tire print from the scene where limbs were found was taken and tested for a match to Defendant's Corvette and truck. There was no match to either vehicle. Further, "Timberline" (sic) boots found with the garbage bags containing body parts, and the sole pattern, dirt, fibers, and plant debris on them did not match anything found in Defendant's car and truck. She also took sample from the carpets in both of Defendant's residences. They did not match any of the samples taken from the deceased. Clothing and skin of the deceased did not contain any hairs or DNA matched to Defendant. Clothing and shoes taken from Defendant's home did not yield any trace evidence that was relevant to the case. No human hair collected with lint tape yielded any hair that matched evidence found on the deceased. None of the trace evidence in the garbage bags matched Defendant.

There was no gunshot residue on the body of the deceased. Ms. Watkins[] did, however, find glass rods on a swab from the middle finger, left hand, which indicates the presence of insulation. It did not match evidence from Defendant's residences. None of the hair taken by Ms. Watkins matched Defendant. There was no blood at the

11

Adams or Munson Court residences that was connected to the crime scene or the deceased. The houses were processed for about two and one half and three hours respectively. Soil samples and household items, including Defendant's shoe, were taken from the houses, and nothing was connected to the crime scene or the crime. A garbage bag wit[h] hangers inside was found at the Adams street residence; the knot was not the same as those on the bags which contained the body parts at the crime scene. Defendant's clothing, delivered to Watkins by Detective Bluew, did not yield any inculpatory evidence.

**Ann Gordon** was qualified as an expert in the area of DNA analysis and statistical analysis. She conducted tests on the samples received from Bridgeport Crime Lab in her duties as a forensic scientist with Michigan State Police Crime Laboratory in Lansing, Michigan. Of the samples, one was a buccal (inside cheek) sample from Defendant, and one was a swab of a .38 special. There were also samples of known Calvin Tubbs material; tissue of the left leg, stump of the right leg, scissors, knife, blade housing and fingernails of the right hand. She found that DNA from the blade housing of the saw matched the sample that was a match to the known stump of deceased's right arm. She found no DNA on the scissors or the knife. The sample from the trigger and revolver grip were tested in nine areas. At eight of the areas, she matched the sample to Defendant. She explained that she could not exclude him but could exclude Mr. Tubbs. Ms. Gordon testified that she tested the revolver's trigger, grip, and inner and outer part of the barrel against Defendant's DNA. She found two possible donors, including Defendant as one who could not be excluded. The deceased was excluded as a match on the gun. During cross-exam, Ms. Gordon testified that no DNA was found on the knife or the scissors. She also stated that she was not given the whole saw to test for DNA, only the blade. Thus, she did not know whether there might be other DNA on other parts of the saw.

**Larissa White** testified that Defendant is her fiancee and the father of her 14-year old daughter. He lived back and forth between Adams and Munson Court in October 2003. Over objection, she testified that she had asked him not to have guns in the house prior to October and November, 2003.

Ms. White also testified that Bukie's girlfriend, Sandy, called the house on October 27, 2003 wanting to speak with Defendant, who was not there. He arrived home about 9:30 p.m. He did not mention being with Bukie. Over objection, Ms. White testified that Defendant was "a private guy" and that he owned a truck and a gray "Vette". She testified that Defendant always parked his car and truck in her garage on Munson Court; he did not stop driving them after November 5, 2003. Two detectives spoke with Ms. White at her home on November 20, 2003. She lied about defendant's whereabouts, stating that she had not seen him, when he was actually in the bedroom on Munson Court. Ms. White further testified, over objection, that Defendant did not tell her that he had stopped going to work at Dow as of the date of the statement, November 20, 2003. She also testified, over objection, that Defendant did not have much of a reaction to Bukie's death. During cross-examination, Ms. White stated she did not personally know Bukie or Calvin Tubbs, had never seen Defendant with Bukie, and had not seen Bukie in the Munson Court home. Bukie phoned the house to speak with Defendant once or twice a week.

12

**Detective Randy Pfau** testified that he interviewed Larissa White at her home on November 20, 2003. Over objection, he related that she said that she had not seen Defendant since the day before. She also would not consent to a search of the Corvette and the truck in the garage, so he and other officers returned at 2 p.m. with a search warrant. They rammed the front door when no one answered. A dining room chair was flung aside as the door opened. He heard noise and a door opening in one of the bedrooms. The Defendant came out and walked towards them with his hands at his sides; he did not lie on the ground, as police commanded. He was taken into custody. Police found an unloaded .38 caliber Smith and Wesson on the floor of the room Defendant emerged from. It was identified as Exhibit 159, which was admitted into evidence.

**DEFENSE EVIDENCE.** Defendant called **Detective Frank Smith** as the first witness. He testified that an attorney, Steven Eimers, contacted him on or about November 13th and November 19th, 2003, to set up a meeting with Defendant. That meeting never took place because Defendant was arrested a day or two later. On cross-examination, the witness stated Mr. Eimers would not make an appointment until about the 26th of the month when they last spoke to him on November 19, 2003. Detective Smith stated he and Detective Pfau went to "each and every residence that we knew where he lived" but did not find him. **Randy Pfau** was called by defense and testified that Defendant told him during an interview on November 10, 2003 that he had seen the deceased on October 27, 2003. Defendant was not evasive and answered all questions. Defendant told Pfau that the word on the street from one Lisa White was that Defendant's life was in danger because "some Jamaicans had killed Mr. Tubbs and Mr. Abby was next." The detective spoke to Lisa White, but she would not talk to him over the phone.

**Detective Kenneth Bluew** was called by the defense and testified that [he] obtained the saw, Exhibit 98[,] because Mr. Jerry Boose came to see him and directed him to Victor Hunter, who had the saw. In an interview on December 1, 2003, Boose told the witness that Defendant had borrowed a chain saw from him and then a reciprocating saw from Victor Hunter. The defense rested.

Def.-Appellant's Br. on Appeal, in *People v. Abby*, No. 262365 (Mich. Ct. App.), at 1-14 (internal citations omitted).

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by

providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether

14

the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.   *Sufficiency of the Evidence Claims (Claims I, V & IX)*

In his first, fifth, and ninth claims petitioner contends that the evidence was insufficient to support his conviction for second-degree murder. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.   *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

It is well-established that a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.3d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations." *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995). It is the job of the jury, not this Court sitting on habeas review, to resolve

16

conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson v. Virginia*, 443 U.S. 307, 326 (1979); *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

2.     *Analysis*

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* Mich. Comp. Laws § 750.317. Second degree murder consists of four elements: (1) a death; (2) caused by an act of the defendant; (3) with malice; and (4) without lawful justification or excuse. *See People v. Smith*, 478 Mich. 64, 70, 731 N.W.2d 411, 414-15 (2007) (citing *People v. Goecke*, 457 Mich. 442, 464, 579 N.W.2d 868 (1998)). "Some evidence must be presented regarding each element of the crime or from which those elements may be inferred." *People v. Goecke*, 457 Mich. 442, 470, 579 N.W.2d 868 (1998) (citing *People v. Doss*, 406 Mich. 90, 100-01, 276 N.W.2d 9 (1979)). In his brief, Petitioner concedes elements one and four, but argues that the evidence was insufficient to prove beyond a reasonable doubt that petitioner killed the victim with malice and that the victim's death was caused by an act of petitioner.

In order to show malice, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm;

17

or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). The prosecution may establish the elements of a crime through circumstantial evidence that creates a reasonable inference that an element is satisfied. *See Kelly v. Jackson*, 353 F.Supp.2d. 887, 891 (E.D. Mich. 2005) (citing *People. v. Goecke*, 457 Mich. 442, 463-64, 579 N.W.2d 868 (1998)). As the Supreme Court has explained:

> Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Holland v. United States*, 348 U.S. 121, 140 (1954).

Here, the prosecutor established that prior to the victim's death petitioner had expressed frustration because he couldn't "cut [the victim] loose" on account of the victim's knowledge of petitioner's illegal activity. Witness testimony also established that petitioner was the last known person to have contact with the victim. Further, forensic evidence established that petitioner's fingerprints were on bags that contained the victim's dismembered limbs and that some of the victim's tissue was located near the blade housing of the saw, which petitioner had borrowed hours after having contact with the victim. Moreover, the evidence showed that petitioner actively sought to acquire the saw. Additionally, petitioner failed to make his presence known when police were questioning his girlfriend concerning the offense. Further, police found a .38 caliber revolver on the floor of a child's bedroom from which petitioner emerged after police forcibly entered the house to conduct a lawful search. Although testimony established that the saw was not the cause of death, the

above facts indicate petitioner had both motive and opportunity to kill the victim, as well as a guilty conscience after the victim's death. Taken as a whole, this evidence was sufficient for any reasonable trier of fact to infer that petitioner harbored, at a minimum, an intent to harm the victim with death being the probable result of such harm. That the evidence might equally support other, innocent, inferences is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326.

With respect to the second element of second degree murder, no direct evidence indicates that petitioner caused the victim's death. However, the circumstantial evidence establishes that petitioner went to great lengths to dispose of the victim's body. So much so that investigators were never able to locate the victim's head or torso. Given the strong weight of circumstantial evidence, any rational trier of fact could infer that petitioner went to such pains to mutilate and destroy the victim's body because the body, if found, would incriminate him. Thus, any rational trier of fact could conclude beyond a reasonable doubt that petitioner's actions established that he was, in fact, the cause of the victim's death.[2]

Alternatively, the jury could have concluded that the evidence supported an inference that, even if the victim's death did not occur as a direct result of an act by petitioner, he still aided and abetted the murder. MICH. COMP. LAWS § 767.39 abolished the common law distinction between aiders and abettors and principals, and provides that aiders and abettor may be prosecuted and convicted as though they had directly participated in the crime. *See People v. Palmer*, 392 Mich. 370,

---

[2]Petitioner's sufficiency claims in large part challenge whether the corpus delicti of the crime was established. The separate corpus delicti claim is discussed in the following section. To the extent petitioner challenges the sufficiency of the evidence with respect to the victim's death by a criminal agency–which is what the corpus delicti rule requires–the elements of corpus delicti are subsumed by the first two elements of second degree murder.

378, 220 N.W.2d 393, 396 (1974).  Aiding and abetting under Michigan law requires proof of three elements: (1) commission of the underlying crime wither by the defendant or some other person; (2) acts or encouragement by the defendant which aided or assisted the commission of the crime; and (3) intent on the part of the defendant to commit the crime or knowledge by the defendant that the principal intended to commit the crime at the time aid or encouragement was given.  *See People v. Acosta*, 153 Mich. App. 504, 511-12, 396 N.W.2d 463, 467 (1986) (per curiam).  As noted above, a jury may be convinced of a defendant's guilt beyond a reasonable doubt based on circumstantial evidence.  *See Holland*, 348 U.S. at 140; *Kelly*, 353 F.Supp.2d. at 891.   As discussed above, petitioner had motive and opportunity to kill the victim.  Additionally, petitioner answered the telephone at the victim's residence at 10:30 a.m. the day the victim disappeared.  Petitioner and the victim had planned on leaving the victim's residence together.  The victim's downstairs neighbor heard no activity in the victim's apartment after 11:00 a.m.  Three hours later petitioner was seeking a saw.  Petitioner's brother had a phone conversation with petitioner concerning a saw.  During this conversation, petitioner's brother heard the voice of an unidentified person in the background.  In addition, police found unidentified fingerprints along with petitioner's on garbage bags which contained the victim's dismembered limbs.  Also, lab results indicate that DNA which did not belong to petitioner was on the grip of petitioner's revolver.  This circumstantial evidence supports the inference that (1) the victim's death was intentional, whether by petitioner or some other person; (2) petitioner, if not the person who killed the victim, was present at the time of death and helped dispose of the body; and (3) petitioner knew there was a high probability that the victim would sustain serious bodily injury while petitioner was present, from which death was a likely result.  Thus, any rational trier of fact could have determined that petitioner aided and abetted the crime of second degree murder, for which he was held liable as a principal.

In sum, the weight of circumstantial evidence could allow any rational trier of fact to conclude beyond a reasonable doubt that each element of second degree murder was established, or, at a minimum, that petitioner aided and abetted the murderer. Accordingly, this Court should conclude that petitioner is not entitled to habeas relief on his insufficient evidence claim.

E.     *Evidentiary Claim (Claims IV & IX)*

Petitioner also contends that hearsay testimony concerning petitioner's involvement in drug trafficking was erroneously admitted into evidence, thereby depriving petitioner of his fundamental right to a fair trial. The Court should conclude that petitioner is not entitled to relief on this claim.

1.     *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, and issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the

21

fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a court grant habeas corpus remedy." *Barrett v. Acevado*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right—such as the right to confront witnesses or to present a defense—is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

    2.    *Analysis*

*a. Drug Trafficking and Gun Testimony (Claim IV)*

Petitioner contends that he was denied a fair trial by the introduction of testimony that he engaged in drug trafficking, and that he possessed a gun when he was apprehended by the police. This claim is without merit. As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). Here, the evidence of petitioner's drug trafficking was admissible for the proper purpose of establishing his motive, *see Abby*, 2007 WL 602562, at *6, slip op. at 6-7, and the circumstances in which the gun was recovered made the gun relevant to showing petitioner's

22

consciousness of guilt, *see id*. at *8-*9, slip op. at 8-9.  The witnesses presenting this testimony were subject to cross-examination, and petitioner has made no argument showing that the evidence was so "totally unreliable" that "the factfinder and the adversary system [would] not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot*, 463 U.S. at 899.  Nor was the testimony concerning his statements about drug trafficking impermissible hearsay, because it constituted the admission of a party opponent under MICH. R. EVID. 801(d)(2)(A).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these evidentiary claims.

### *b.  Hearsay Testimony*

Petitioner also contends that the trial court violated his right to confront the witnesses by introducing evidence of the victim's out-of-court statements to Eugenia Hardy that he planned to participate in a large purchase of marijuana with petitioner.  The Court should reject this claim.

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.  The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause.  *See Pointer v. Texas*, 480 U.S. 400, 406 (1965).  At the time of petitioner's trial, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980).  In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings.  Thus, the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable.  Even then, his statement is admissible only if it bears adequate "indicia of reliability."  Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66.  As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception.  The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability."  *Idaho v. Wright*, 497 U.S. 805, 821 (1990).  Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection."  *Roberts*, 448 U.S. at 66 (internal quotation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004), decided shortly after petitioner's trial, the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements.  After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  *Crawford*, 541 U.S. at 59.  The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause.  *See id.* at 60-68.  The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  *Id.* at 68-69.  In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'"  *Crawford*, 541 U.S. at 68.  The Court did, however, provide some guidance.  Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

24

[1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (internal quotations and citations omitted). While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

*Crawford* establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay. The question therefore remains whether *Roberts* has any applicability to this case to the extent that the statements admitted at petitioner's trial were not testimonial hearsay under *Crawford*. Because it is now clear that the Confrontation Clause is not at all concerned with non-testimonial hearsay, the Court should conclude that *Roberts* has no application here. In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the admission at trial of non-testimonial hearsay. The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. Immediately following *Crawford*, the Courts concluded that *Roberts* remained applicable to non-testimonial hearsay, observing:

[t]he lynchpin of the *Crawford* decision thus is its distinction between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to

the former category of statements. . . . [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005); *see also*, *Horton v. Allen*, 370 F.3d 75, 83-84 (1st Cir. 2004); *United States v. Johnson*, 354 F. Supp. 2d 939, 964 (N.D. Iowa 2005); *United States v. Savoca*, 335 F. Supp. 2d 385, 391-92 (S.D.N.Y. 2004).  Regardless of whether this reading of the *Crawford* dictum was correct, the Supreme Court has since clarified that the Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay.  In *Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether the Confrontation Clause applies only to testimonial hearsay," *id.* at 823, and in doing so abrogated *Roberts* in whole.  The Court noted that the answer to this question was suggested in *Crawford*, when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who give "testimony."  *Id.* at 823-24 (discussing *Crawford*, 541 U.S. at 51).  The *Davis* Court explained that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." *Id.* at 824  Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered.  *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability.  Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

26

Analyzing the issue under *Crawford*,[3] the court of appeals concluded that "the statement at issue here was not testimonial in the sense envisioned by the Court in *Crawford*," because the statement occurred "in an informal setting between family members with no indication that the conversation was intended to further an investigation or prosecution," and because there "was no police or prosecutorial involvement in the discussions." *Abby*, 2007 WL 602562, at *7 n.4, slip op. at 8 n.4. This determination was reasonable. It is well established that statements to friends and acquaintances in a social setting do not constitute testimonial hearsay under *Crawford*. *See Doan v. Carter*, 548 F.3d 449, 458 (6th Cir. 2008) (victim's statements to family and friends regarding abuse she had received at hands of petitioner not testimonial); *United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (citing cases) (casual statements to family and acquaintances nontestimonial under *Crawford*). Thus, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Corpus Delecti Rule (Claim IX)

Petitioner also argues that the trial court violated the *corpus delicti* rule when it admitted the allegedly hearsay testimony of Taylor and Hardy, which concerned petitioner's statements about his activities in the drug trade. The prosecution used this evidence in an attempt to establish motive, however, no independent evidence exists for how the victim died. Thus, petitioner argues, the court erroneously admitted the testimony. The Court should conclude that petitioner is not entitled to

---

[3]Reading *Crawford* as keeping in place the *Roberts* test for nontestimonial hearsay, the court of appeals initially analyzed petitioner's claim under *Roberts*, concluding that the evidence was properly admissible under the firmly rooted hearsay exception for statements reflecting a "declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling pain, and bodily health)." MICH. R. EVID. 803(3). The Supreme Court's subsequent clarification that the Confrontation Clause applies only to testimonial hearsay renders irrelevant the court of appeals's analysis under *Roberts*.

habeas relief on his *corpus delicti* claim, for three reasons.

First, petitioner's claim is simply not open to habeas review because the *corpus delicti* rule is not constitutionally mandated.  Thus any violation of a state law *corpus delicti* rule is not cognizable on habeas review.  *See Evans v. Luebbers*, 371 F.3d 438, 442-43 & n.3 (8th Cir. 2004); *Lucas v. Johnson*, 132 F.3d 1069, 1078 (5th Cir. 1998); *Emerson v. Smith*, No. 00-CV-73044, 2001 WL 561212, at *12 (E.D. Mich. Apr. 13, 2001) (Borman, J.).

Second, even if this Court could grant habeas relief on this claim, the *corpus delicti* rule does not apply.  As the Michigan Court of Appeals has explained, the *corpus delicti* rule "bars the prosecution from using a defendant's confession in any criminal case unless it presents direct or circumstantial evidence independent of the defendant's confession that the specific injury or loss occurred and that some criminal agency was the course or cause of the injury."  *People v. Ish*, 252 Mich. App. 115, 116, 652 N.W.2d 257, 258 (2002); *see also*, *People v. McMahan*, 451 Mich. 543, 548, 548 N.W.2d 199, 201 (1996)..  The court of appeals has also explained, however, that the *corpus delicti* rule prohibits introduction only of admissions of guilt; it does not apply to statement which are merely "admissions of fact which by themselves [do] not constitute an admission of guilt."  *People v. Rockwell*, 188 Mich. App. 405, 407, 470 N.W.2d 673, 674 (1991).  Here, the *corpus delicti* rule is not operative.  Although several of petitioner's statements admitted incriminating facts and guilty conduct concerning his drug dealing, petitioner never confessed to the murder.  Without a confession by petitioner, there is nothing upon which the *corpus delicti* rule may attach.  Thus, the trial court could not violate the rule because the rule was not in effect.

Finally, even if the claim was cognizable and applicable in petitioner's trial, the prosecution presented sufficient independent evidence of the *corpus delicti* to admit petitioner's statements.  Under Michigan law, "the corpus delicti of murder requires proof both of a death and of some

28

criminal agency that caused that death." *McMahan*, 451 Mich. at 549, 548 N.W.2d at 201. These elements mirror the first two elements of second degree murder, discussed above. And as with the elements of the crime, the corpus delicti may be established by circumstantial evidence. *See People v. Modelski*, 164 Mich. App. 337, 342, 416 N.W.2d 708, 710 (1987). Further, the *corpus delicti* need be established only by a preponderance of the evidence. Here, the fact that the defendant's body was found dismembered and disposed of in different locations in an attempt to conceal the body parts was sufficient to establish by a preponderance of the evidence that the victim had died by some criminal agency. And contrary to petitioner's argument, the *corpus delicti* rule does not require that there also be evidence that he killed the victim before his statements were admitted; all that is required is a showing that the victim died as a result of any criminal agency. "Proof of the identity of the perpetrator of the crime is not part of the *corpus delicti*." *People v. Schumacher*, 276 Mich. App. 165, 180, 740 N.W.2d 534, 546 (2007); *see also*, *People v. Konrad*, 449 Mich. 263, 270, 536 N.W.2d 517, 520 (1995); *People v. Cotton*, 191 Mich. App. 377, 386, 478 N.W.2d 681, 685 (1991).

In short, petitioner's *corpus delicti* claim is not cognizable on habeas review. Moreover, even if this claim were open to review, the trial court correctly did not invoke the *corpus delicti* rule, and in any event the evidence was sufficient to establish the *corpus delicti*. Accordingly, this Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Instructional Error (Claims II & III)*

Petitioner next contends that the trial court erred in instructing the jury because the court failed to give an intervening cause of death instruction and issued an aiding and abetting instruction. The Court should conclude that petitioner is not entitled to relief on these claims.

1.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the

29

application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws).  Thus, in order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *See Estelle*, 502 U.S. at 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal).  As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'"  *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

     2.    *Denial of Intervening Cause Instruction (Claim II)*

Petitioner contends that he was unconstitutionally denied an intervening cause of death instruction.  Testimony established that the victim was a drug user.  Further, the victim could also have died at the hands of "Jamaicans".  Consequently, the victim's death could have been due to an intervening cause.  Thus, petitioner argues,  the court deprived him of a defense when it denied his request for an intervening cause of death instruction.  This claim is without merit.

In denying relief on this claim, the court of appeals rejected petitioner's argument that the jury should have been permitted to decide whether the victim's death was caused by the dismemberment or by some other action, because this was simply not an issue at trial.  The court explained that "the forensic pathologist who examined Tubbs' remains definitively testified that dismemberment occurred

30

after death, and no evidence to the contrary was presented at trial." *Abby*, 2007 WL 602562, at *4, slip op. at 4.  Because there was no evidence of any intervening cause, the court concluded, an intervening cause instruction was not warranted.  This determination was reasonable.  Under the intervening cause doctrine, where a separate cause intervenes between the defendant's action and the victim's death, this intervening cause will negate the required showing of proximate cause.  As the Michigan Supreme Court has explained, "[w]here an independent act intervenes between the act of a criminal defendant and the harm to a victim, that act may only serve to cut off the defendant's criminal liability where the intervening act is the sole cause of harm."  *People v. Bailey*, 451 Mich. 657, 677, 549 N.W.2d 325, 334 (1996).  However petitioner's theory of the case, both at trial and here, was not that he committed some act which harmed the victim and that a subsequent, intervening act actually caused the victim's death.  Rather, petitioner's theory was simply that he did not commit any act leading to the death of the victim.  In other words, petitioner's "argument only implicates whether there was evidence that [he] caused [the victim's] death, not whether an intervening event caused h[is] death."  *People v. Parker*, No. 263276, 2007 WL 486485, at *7 (Mich. Ct. App. Feb. 15, 2007) (per curiam).  Thus, petitioner was not entitled to an intervening cause instruction, and the absence of such an instruction did not deprive him of a fair trial.

      3.    *Aiding and Abetting Instruction (Claim III)*

Petitioner next argues that the court improperly gave an aiding and abetting instruction.  This claim is without merit.  As noted above, an improper jury instruction warrants habeas relief only when the instructions are so deficient that they render the entire trial fundamentally unfair.  *See Estelle*, 502 U.S. at 72; *Henderson*, 431 U.S. at 154.  In rejecting petitioner's claim, the court of appeals concluded that there was evidence presented warranting an aiding and abetting instruction, reasoning that petitioner's brother testified to overhearing someone in the background when petitioner called to ask

him for a saw.  That person described to petitioner the type of saw needed, and petitioner failed to identify that person despite his brother twice asking him to do so.  Further, DNA and fingerprints from an unidentified individual were found on the bags containing the victim's limbs.  *See Abby*, 2007 WL 602562, at *5, slip op. at 5.  This determination was reasonable.  As noted above in connection with petitioner's sufficiency of the evidence claim, and as explained by the court of appeals, there was evidence in the record suggesting that another person was involved in the crime, at least as of the time petitioner was attempting to dispose of the body.  This evidence was sufficient to warrant an aiding and abetting instruction, and thus petitioner was not denied a fair trial by the trial court's giving of such an instruction to the jury.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.     *Prosecutorial Misconduct (Claims V & VI)*

Petitioner raises various claims of prosecutorial misconduct.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, the court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the

32

strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2.      *Analysis*

a.  *Misrepresentation of the Evidence*

Petitioner first alleges that the prosecutor committed misconduct when he presented a theory of the case during closing argument that misrepresented the evidence. He argues that the prosecutor misrepresented the evidence when he repeatedly referenced petitioner's revolver during closing argument. No evidence established the gun as the murder weapon, not did the evidence show that petitioner was in the habit of carrying a firearm. Thus, petitioner alleges, the prosecutor improperly concluded that petitioner shot the victim with the revolver and was accustomed to carry a weapon.

Petitioner's claim is without merit. The circumstantial evidence was sufficient for the prosecutor to infer that the gun was the murder weapon and that petitioner was accustomed to carry it. Police found the revolver behind the headboard of the bed located in the bedroom of petitioner's girlfriend's 14-year old daughter, from which they heard petitioner exit while they were conducting a search of the premises. Police also found two rounds of .38 caliber ammunition located under the mattress of the same bed. Petitioner's girlfriend testified that the gun wasn't hers and that she wasn't aware of any guns in the house. DNA of petitioner and another unidentified person were on the grip of the revolver. Taken as a whole, this evidence supports the conclusion that petitioner hid the revolver and ammunition when the police started their search of the house, and that petitioner was likely accustomed to carrying this revolver. Although this gun was not directly established as the murder weapon, the prosecutor did not unreasonably infer that it was likely the weapon which killed

33

the victim. Thus, the prosecutor's closing argument was founded on evidence introduced at trial.

Petitioner also contends that the prosecutor misrepresented evidence by suggesting that petitioner used the saw to dismember the victim. However, forensic evidence at trial established the presence of the victim's DNA on the saw. Although there was no forensic evidence tying petitioner to the saw, there was testimonial evidence that did so. Thus, the prosecutor's argument was a fair inference from the evidence adduced at trial. Accordingly, the Court should conclude that petitioner is not entitled to relief on this claim.

### b. Comment on Petitioner's Silence

Petitioner next contends that the prosecutor committed misconduct by commenting on his silence. This claim is without merit. During closing argument, the prosecutor referenced, as evidence of petitioner's consciousness of guilt, the fact that petitioner hid in the bedroom while two detectives were talking to his girlfriend, rather than coming out and talking to the officers. *See* Trial Tr., Vol. VIII, at 10. The court of appeals found that this comment was not improper, because "a defendant's constitutional right to remain silent is not violated by a prosecutor's comment on his silence before custodial interrogation and before *Miranda* warnings have been given." *Abby*, 2007 WL 602562, at *11, slip op. at 11. This determination was reasonable.

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The Supreme Court has determined that this provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation

34

subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Nevertheless, the Court's subsequent cases have made clear that *Griffin* and *Doyle* are limited to situations in which the defendant's silence was induced by the governmental assurances embodied in the *Miranda* warnings. *See Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (per curiam) (post-arrest statements made before *Miranda* warnings are given may be commented upon by prosecutor, noting that the Court has "consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."); *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (pre-arrest silence may be used for impeachment because "no governmental action induced [the defendant] to remain silent before arrest.").

Here, there is nothing to indicate that petitioner's silence occurred while he was in custody or was induced by the *Miranda* warnings. It is true that several courts of appeals, including the Sixth Circuit in a case upon which petitioner relies, have held that it violates the Fifth Amendment to use a defendant's pre-arrest silence as substantive evidence of guilt. *See Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2003). However, this is a question on which the courts are equally divided, *see id*. at 282, and, more importantly for purposes of § 2254(d)(1), the Supreme Court has never held that the use as substantive evidence of a defendant's pre-arrest silence not induced by the *Miranda* warnings violates the Fifth Amendment. On the contrary, the Court in *Jenkins* explicitly declined to "consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment." *Jenkins*, 447 U.S. at 236 n.2; *see also*, *Portuondo v. Agard*, 529 U.S. 61, 70 (2000) (noting the *Jenkins* Court's observation that "it was not clear whether the Fifth Amendment protects pre-arrest silence."). As the Supreme Court has explained on several occasions, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009)

35

(internal quotation omitted); *accord Wright v. Van Patten*, 128 S. Ct. 743, 747 (2008).  Thus,

> [t]he Supreme Court's failure to rule on this issue, coupled with the "disagreement and confusion" among the federal courts concerning the resolution of this issue, precludes this court from finding that the Michigan Court of Appeals' decision was an unreasonable application of clearly established federal law, where clearly established Supreme Court precedent on the issue of using prearrest silence as substantive evidence of guilt did not, and does not, exist.

*Mitchell v. Lafler*, No. 02-CV-74805, 2003 WL 21817616, at *4 (E.D. Mich. July 10, 2003) (Cohn, J.) (citing *Worden v. McLemore*, 200 F. Supp. 2d 746, 752-53 (E.D. Mich. 2002)), *aff'd*, 118 Fed. Appx. 24, 27 (6th Cir. 2004); *see also*, *Jones v. Trombley*, 307 Fed. Appx. 931, 934 (6th Cir. 2009). Because the court of appeals's determination was a reasonable application of clearly established federal law, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c.  Shifting of Burden of Proof

Petitioner also contends that the prosecutor impermissible shifted the burden of proof by noting during closing argument that petitioner was "not making a claim of self-defense" and that "[t]here is no claim of self-defense.  There's no claim of accident.  There's no claim that justifies, mitigates this to anything but a murder." Trial Tr., Vol. VIII, at 14, 28.  These comments did not shift the burden of proof to petitioner.  Nothing in them suggested a duty on the part of petitioner to come forward with any evidence, or to bear any burden of proving his defense theory.  Rather, the prosecutor was merely clarifying for the jury that the only issue before the jury was whether petitioner killed the victim, in the context of explaining why the evidence showed that he did so.  Thus, petitioner is not entitled to habeas relief on this claim.

### d.  Arguing Gun Evidence and Aiding and Abetting Theory

Petitioner next argues that the prosecutor's arguments regarding the gun evidence admitted at trial and regarding petitioner's guilt on an aiding and abetting theory were improper.  This

36

argument, however, is premised on petitioner's underlying claims that the gun evidence was not

admissible and that the aiding and abetting theory was not properly placed before the jury. As

discussed above, however, these underlying claims are without merit. Because the gun evidence was

admitted and the aiding and abetting theory was properly instructed to the jury, the prosecutor did not

commit misconduct by commenting on these matters during closing argument. Accordingly, the

Court should conclude that petitioner is not entitled to habeas relief on this claim.

### e. Appeal to Civic Duty

Petitioner next contends that the prosecutor improperly appealed to the jury's sense of civic

duty by arguing:

> [Y]ou folks by taking an oath when you were sworn in as a juror, you swear to listen
> to the evidence and to base your decision on that and that alone. Other people who are
> not in your position perhaps who are out there in the community day-to-day, they may
> pick up the newspaper or watch their – watch their TV news and hear a story about
> something that's happened that's just unbelievable and appalling that people can treat
> each other in such a way. And perhaps they just set that newspaper aside and go on
> and have their cup of coffee, and just put it out of their minds and forget about it and
> ignore it. Go, no, no, no, that can't be true.
>     And maybe that makes them feel more secure in their own personal life, and
> more comfortable to go into a denial that this is going on, but you folks do not have
> that luxury. You can't walk around with blinders on. You've taken the responsibility
> of looking at this evidence and thinking about it and analyzing it in a common sense
> way in the light of reason and not fantasy, not imagination, but reality.

Trial Tr., Vol. VIII, at 12. The Court should reject this claim.

A "civic duty" argument is one which "encourages the jury to convict the defendant based

upon principles of protection of the community and encourages them to ignore the evidence in the

case." *United States v. Mejorado-Soto*, No. 94-2404, 1995 WL 764115, at *2 (6th Cir. Dec. 27,

1995) (per curiam). Here, the prosecutor did neither. Nothing in the prosecutor's argument

encouraged the jury to convict the defendant to protect the community. Rather, the prosecutor merely

emphasized the important duty the jury had to consider the evidence in the case. Nor did the

37

prosecutor encourage the jury to ignore the evidence in the case. On the contrary, the prosecutor explicitly noted that the jury had the responsibility to "look[] at this evidence and think[] about it and analyz[e] it in a common sense way," and to base its decision only on the evidence presented at trial. Thus, the prosecutor's comment was not improper.

### f. Referencing Petitioner's Economic Status

Finally, petitioner contends that the prosecutor committed misconduct by referencing the fact that he was retired from his job and by introducing evidence concerning his lifestyle. Contrary to petitioner's argument, the prosecutor did not argue that the jury should convict petitioner because he was retired or because of his unexplained wealth. Rather, the prosecutor's comments occurred in the context of arguing that petitioner was involved in the drug trade, and that this involvement provided the motive for the murder. And evidence of unexplained wealth is generally admissible to show that a defendant is involved in narcotics trafficking. *See United States v. Lane*, 192 F.3d 556, 574 (6th Cir. 1999); *United States v. White*, No. 95-2059, 1997 WL 345730, at *5 (6th Cir. June 20, 1997); *United States v. Copeland*, 51 F.3d 611, 617 (6th Cir. 1995). Thus, the prosecutor did not commit misconduct by commenting on these matters. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

### H.    Counsel Claims (Claims VII & VIII)

Finally, petitioner raises several claims relating to his counsel. In claim VII, he contends that he was denied the effective assistance of counsel at trial in various respects. In Claim VIII, he contends that he was deprived of counsel altogether at trial and sentencing. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

### 1.    Denial of Counsel (Claim VIII)

Petitioner contends that he was denied his choice of counsel because one of his two retained

attorneys, James Piazza, was not available at trial and the court refused to grant a continuance, instead requiring petitioner to proceed only with the assistance of his other retained counsel, James Gust. Petitioner also contends that he was denied counsel at sentencing, because by that point he and Mr. Gust had an irreconcilable conflict. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

### a.  Clearly Established Law

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. This right contemplates a corollary right to the counsel of one's choice. As the Supreme Court has explained, "'the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.'" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989)). Thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). This right, however, is not absolute, and "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988); *see also*, *Gonzalez-Lopez*, 548 U.S. at 144.

For example, "[t]he Sixth Amendment requires only that the defendant be given a fair or reasonable opportunity to obtain particular counsel; it does not guarantee an absolute right to the counsel of one's choice." *United States v. Paternostro*, 966 F.2d 907, 912 (5th Cir. 1992); *see also*, *Gonzalez-Lopez*, 548 U.S. at 144; *United States v. Baker*, 432 F.3d 1189, 1248 (11th Cir. 2005). Further, and importantly, the right to counsel of one's choice "must be balanced against the court's

authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988); *see also*, *Lockett v. Arn*, 740 F.2d 407, 413 (6th Cir. 1984) ("Although a criminal defendant is entitled to a reasonable opportunity to obtain counsel of his choice, the exercise of that right must be balanced against the court's authority to control its docket."). Further, trial courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citations omitted) (citing *Wheat*, 486 U.S. at 160; *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983)).

Where a trial court denies a continuance for a defendant's choice of counsel to be retained or appear at trial, the trial court's decision is deferentially reviewed. "The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). At the same time, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Id*. In short, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel." *Morris*, 461 U.S. at 11-12 (quoting *Ungar*, 376 U.S. at 589).

### b. Trial

Trial commenced on February 24, 2005, with Mr. Gust conducting the *voir dire* on behalf of petitioner. After jury selection had been completed and the jury empaneled, some discussion occurred regarding the fact that Mr. Piazza had another trial, and would not be in court to assist petitioner. The court and the attorneys apparently discussed the matter off the record, and the following morning

before the proceedings commenced the following discussion took place between the court, Mr. Gust,

Mr. Piazza, and the prosecutor, Mr. Fehrman:

> MR. FEHRMAN: . . . . Your Honor, I think that we really need to resolve this counsel issue in some fashion.  And I know from our discussions back in chambers that the Court had indicated to both myself and Mr. Gust that – and in a conversation with Mr. Piazza, that he had indicated to you that he was hired for a limited purpose, that is for the motions, which have concluded.
>
> And I think that Mr. Piazza's just down the hallway, and if they haven't started yet, perhaps Mr. Piazza could come down here and explain, you know, so we have a definite record exactly what the situation is regarding counsel from his point of view.  I don't think we should leave this murky at all.

> THE COURT: Well, I'm – we're going to start this morning.  This case has been set for I don't know how many months.  It was a date certain setting.  I learned I think within the last week that there were two attorneys involved in the case, and there was never any request made of this Court to adjourn either this matter or the other case.
>
> The Court Rule I know provides that where there is a conflict when there is counsel involved, the Court consults with the other judge.  That I take it to be when there are – when there's only one attorney involved.  Here we have Mr. Gust. And, as I indicated, Mr. Gust is one of our more experienced counsel here in Saginaw, and I don't say it often, but effective counsel, and we're going to – we're going to start.  So that's all in that regard.  Anything else?

> MR. GUST: Mr. Abby just want to make sure that the record's clear, Your Honor, that, you know he anticipated that two lawyers would be present.  I'm not sure what Mr. – what Mr. Piazza stated to the Court.  He did file an appearance and the appearance is in the file.  So I think that is clear and plain that he intended to participate in the trial.

A short break was taken, and Mr. Piazza was brought into the courtroom, at which point the

discussion continued:

> MR. PIAZZA: . . . . May it please the Court, I am in trial on a 10-count armed robbery, carjacking, conspiracy case with co-defendants in Judge Heathscott's.  We selected a jury yesterday.  We're

41

about ready to take testimony today.  It probably will go into next week Tuesday, but that might be the extent of it.

My understanding of this particular case – Mr. Gust and I have had several discussions.  Mr. Gust is lead counsel in this particular case.  If I may have a moment.

The court then permitted the parties to briefly confer regarding the matter, after which the discussion again continued:

MR. GUST:  Your Honor, we've had some discussions, and I think the position of Mr. Abby is that he had hired two lawyers.  He wanted two lawyers here.  I think it – there may have been some miscommunication, misunderstanding between Mr. Abby and myself, Mr. Piazza to a certain degree.

However, his wishes are – are clear and plain that he expected us to be here together as a team.  We had some discussions yesterday regarding that and we proceeded.  The Court was aware of that prior to choosing the jury.

If – as an alternative, I had suggested to Mr. Fehrman if there were witnesses that we could all agree that would – some police witnesses and others that would not necessarily be as significant as others and that as far as, you know, just individuals who found evidence and seized evidence and were in the chain of custody, people like that, that maybe we could have witnesses and start those as an alternative to just forging onward contrary to the wishes of the defendant.

MR. FEHRMAN:  Well, Your Honor, I don't think that the defendant can dictate to the prosecution how it presents its case, and I intend to present the case in the most professional and competent way possible, and I don't intend to change my strategy based on the dictates of the defendant in this case.

MR. PIAZZA:  And, just for the record, I was brought in to assist Mr. Gust.  Mr. Gust is lead counsel.  Mr. Gust and I have had several conversations how to handle the case.  Apparently Mr. Abby is on a different plane with that.  And I am in trial on a 10-count armed robbery case.

THE COURT:  All right.  So the record's clear, this matter was set back in October, and the first that there was any mention that defense wanted two counsel I believe was yesterday, if I recall.

MR. GUST:  I believe – I think Mr. Piazza filed his appearance maybe last

42

summer.

MR. PIAZZA:          Yes, I did.

THE COURT:          That's true.  But as far as his – I was also told that Mr. Piazza
                    was in here for purposes of the motions.  Am I correct?

MR. PIAZZA:          That's correct.  Mr. Gust and I divied up the work.  Mr. Gust
                    was going to handle the factual basis and I was going to handle
                    the legal issues and legal motions.  That's how we agreed to
                    divvy up the work in this particular case.  I handled pretrial
                    motions as well as prepared jury instructions and am prepared
                    to handle any motion for directed verdict.

The trial judge, after initially indicating his intention to proceed with the trial, took a short recess to

further consider the matter.  When he returned, the judge explained his ruling:

THE COURT:          The Court took a break in an effort to try and find whether
                    there was any law particularly on point and was unable to
                    locate any.
                            The Court is aware that defendants are entitled by the
                    Sixth Amendment to have counsel represent them at critical
                    stages of proceedings, as this, obviously, is a critical stage of
                    the proceeding.  Counsel is present.  Both attorneys in this case
                    have acted together and/or independently on behalf of the
                    defendant as his agent in representing him.  They both appear
                    to have actual and apparent authority to act on his behalf.
                            I understand the comments that have been made by
                    counsel.  As I indicated, we have a jury.  This was first brought
                    to the Court's attention yesterday.  Mr. Piazza is in trial down
                    the hall.  We are prepared and ready to start proceedings today,
                    and I am going to stand by my decision and we will proceed.

Trial Tr., Vol. II, at 5-11.

On appeal, the Michigan Court of Appeals rejected petitioner's claim that the trial court's

actions deprived him of his right to counsel of his choice.  The court began by characterizing

petitioner's claim as seeking, "in essence, . . . a continuance until such time as Piazza was available

to join his lead counsel at trial."  *Abby*, 2007 WL 602562, at 14, slip op. at 15.  The court of appeals

therefore applied the due process standard set forth by the Supreme Court in *Ungar*, *supra*.  Applying

43

this standard, the court of appeals noted that "'the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers,'" *id.* (quoting *Wheat*, 486 U.S. at 159), and reasoned that "despite Piazza's inability to attend trial, Gust, who the trial court described as 'very qualified and experience[d]" attorney, stood ready to represent defendant at trial." *Id.* The court further reasoned that, despite petitioner's contrary understanding, "both Gust and Piazza, as well as the trial court, seemed to clearly understand Piazza's limited role in defending defendant in this matter." *Id.* at *15, slip op. at 15. In light of these facts and the fact that the trial had been scheduled for trial for five months but the matter was not brought to the trial court's attention until the day of trial, the court of appeals concluded that the trial court did not abuse its discretion in refusing to delay the trial. *See id.*

The Court should conclude that this determination was a reasonable application of clearly established federal law. The court of appeals was correct in treating petitioner's claim as one seeking a continuance, for that is what petitioner sought in the trial court. No action of the trial court prevented Mr. Piazza from representing petitioner. For example, the court did not rule that petitioner was not allowed to have two attorneys represent him, nor did the court disqualify Mr. Piazza. Had the court's actions directly prevented Mr. Piazza from participating, petitioner's right to counsel of his choice would likely have been violated notwithstanding that petitioner had another attorney present and ready to represent him. *See Rodriguez v. Chandler*, 492 F.3d 863, 864 (7th Cir. 2007). Here, however, it was Mr. Piazza's own understanding of his role in the case coupled with his scheduling conflict which prevented Mr. Piazza from assisting at trial. At that point, the only question before the trial court was whether to grant a continuance to delay the start of the trial until Mr. Piazza's other trial had ended. And neither the trial court's nor the court of appeals's analysis of this

44

issue was an unreasonable application of *Ungar* and *Morris*.

The facts before the trial court were that petitioner had retained two attorneys; that the attorneys, and particularly Mr. Piazza, understood that Mr. Gust would be handling the trial, with Mr. Piazza limited to handling legal matters and legal motions; that a scheduling conflict prevented Mr. Piazza from participating at the start of the trial, and until such time as his other trial concluded; and that the scheduling conflict was not brought to the trial court's attention until the day of jury selection, even though the trial had been scheduled for several months. In circumstances similar to these, the courts have generally found no error in a trial court's denial of a continuance. For example, in *Rolon Marxuach v. United States*, 398 F.2d 548 (1st Cir. 1968), the trial court refused to grant a continuance based on the hospitalization of one of the defendant's two attorneys shortly before the start of the trial. The court of appeals found no abuse of discretion, noting that the present attorney had represented the defendant from the beginning of the case, and reasoning that at that late stage of the proceedings a continuance was not due simply as a matter of courtesy. *See id*. at 550-51. Similarly, in *Giacalone v. Lucas*, 445 F.2d 1238 (6th Cir. 1971), the court of appeals found no error in the trial court's failure to grant a continuance in light of trial counsel's hospitalization, where counsel's two partners had participated in the case and were prepared to try it. *See id*. at 1243. The Court reached the same conclusion in *United States v. McManaman*, 653 F.2d 458 (10th Cir. 1981), relying on both *Rolon Marxuach* and *Giacalone* to conclude that the trial court did not abuse its discretion in failing to grant a continuance where one of the defendant's two attorneys was ready to proceed and the request for a continuance had been filed shortly before trial. *See id*. at 460-61. Other federal and state decisions are to the same effect. *See United States v. Allen*, 522 F.2d 1229, 1233 (6th Cir. 1975); *United States v. Upshaw*, 448 F.2d 1218, 1224 (5th Cir. 1971); *Fields v. Strickland*, 444 F. Supp. 795, 801-02 (D.S.C. 1977); *Blair v. State*, 304 S.E.2d 535, 536-37 (Ga. Ct. App. 1983); *People v. Nobles*, 404

45

N.E.2d 330, 332-33 (Ill. Ct. App. 1980); *State v. Burnette*, 337 So. 2d 1096, 1101 (La. 1976); *State v. Christon*, 589 N.E.2d 53, 56 (Ohio Ct. App. 1990); *State v. Hawkins*, 425 S.E.2d 50, 52 (S.C. Ct. App. 1992); *Rogales v. State*, 841 S.W.2d 368, 373 (Tex. Ct. Crim. App. 1992); *States v. Leighton*, 616 N.W.2d 126, 137-38 (Wis. Ct. App. 2000).

The record reflects that the trial court gave careful consideration to the circumstances involved, concluding that a continuance was not warranted in light of the facts that the request came on the day of trial, Mr. Piazza indicated that he was retained for a limited purpose, and petitioner remained represented by Mr. Gust, whom he had also retained. This determination did not amount to an abuse of discretion, nor did it amount to an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay[.]'" *Morris*, 461 U.S. at 11-12 (quoting *Ungar*, 376 U.S. at 589). And it certainly cannot be said, in light of the caselaw discussed above, that the Michigan Court of Appeals's determination that there was no abuse of discretion was an unreasonable application of clearly established federal law. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Sentencing

Petitioner also contends that he was denied his right to counsel at sentencing because the trial court denied Mr. Gust's motion to withdraw, filed one week before sentencing, based on a breakdown in the attorney-client relationship. Petitioner concurred with counsel, but the trial court denied the motion. The Court need not resolve whether, in fact, petitioner was denied his right to counsel at this sentencing procedure, because he was effectively granted the relief he seeks. Although the court of appeals rejected petitioner's sentencing counsel claim on direct appeal, the court did reverse his sentence on a different ground and remand for a new presentence report and sentencing proceeding. At that subsequent proceeding, petitioner was represented by attorney George C. Bush, who filed his

appearance over two months before the resentencing and who appeared at several hearings with petitioner prior to appearing at the resentencing proceeding. Petitioner makes no claim that he was denied his rights to counsel or to counsel of his choice at the resentencing proceeding.

Thus, even if the Court were to conclude that petitioner is correct on his constitutional claim, there is no relief that the Court could grant. Under 28 U.S.C. § 2243, federal courts are given authority to dispose of habeas corpus matters "as law and justice require." 28 U.S.C. § 2243; *see also*, *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). A district court is given broad discretion to determine the type of relief that is appropriate given the facts and circumstances of the case. *See Hilton*, 481 U.S. at 775. As a number of courts have explained, the task of a federal court faced with a meritorious habeas petition is "to fashion relief designed to rectify the prejudice of the violation." *Simmons v. Beyer*, 44 F.3d 1160, 1171 (3d Cir. 1995) (internal quotation omitted). In other words, "[h]abeas remedies should put the defendant back in the position he would have been in if the [constitutional] violation never occurred." *Chioino v. Kernan*, 581 F.3d 1182, 1184 (9th Cir. 2009) (quotation omitted). Here, if the Court were to find a constitutional violation at petitioner's original sentencing proceeding, the appropriate remedy–the remedy that would "put petitioner back in the position he would have been in" had no constitutional violation occurred–would be a new sentencing proceeding in which petitioner's right to counsel was not violated. However, petitioner has already received precisely that remedy through the resentencing proceeding conducted by the trial court on remand from the Michigan Court of Appeals. Thus, his claim relating to sentencing counsel is now moot. *Cf. Lott v. Hargett*, 80 F.3d 161, 167 (5th Cir. 1996); *Jones v. Rapelje*, No. 08-cv-13286, 2010 WL 4366884, at *7 (E.D. Mich. Oct. 28, 2010) (Murphy, J.). Accordingly, petitioner is not entitled to habeas relief on this claim.

2.      *Ineffective Assistance (Claim VII)*

Petitioner also contends that he was denied the effective assistance of counsel in a number of respects.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a. Clearly Established Law

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.*  at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id*. at 695.

### b. Analysis

48

Petitioner contends that trial counsel was ineffective in a number of respects. Specifically, he contends counsel was ineffective for: (1) failing to file a motion for directed verdict; (2) failing to object to the aiding and abetting instruction; (3) failing to object to the prosecutor's closing argument; (4) failing to object to the prosecutor's presentation of hearsay evidence; and (5) failing to object at sentencing. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

With respect to petitioner's claims challenging counsel's failure to object to the aiding and abetting instruction and failing to object to the prosecutor's presentation of hearsay testimony, as explained above in connection with the underlying substantive claims the Michigan Court of Appeals concluded that the aiding and abetting instruction was proper as a matter of state law, and that the evidence was admissible under the Michigan Rules of Evidence. *See Abby*, 2007 WL 602562, at *5, slip op. at 5; *id*. at *5-*7, slip op. at 6-7. In analyzing petitioner's ineffective assistance of counsel claims, these expressions of state law are binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). Counsel cannot be deemed ineffective for failing to object to an instruction proper under state law, or for failing to raise a meritless objection to evidence admissible under state law. *See Mitzel v. Tate*, 267 F.3d 524, 538 (6th Cir. 2001); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993). Likewise, as explained above none of the prosecutor's comments were improper, and thus any objection to the prosecutor's statements would have been futile. Thus, petitioner is not entitled to habeas relief on these ineffective assistance claims.

With respect to petitioner's claim that counsel was ineffective for failing to move for a directed verdict, the Michigan Court of Appeals concluded that counsel was not ineffective because

49

any such motion would have been futile. *See Abby*, 2007 WL 602562, at *13, slip op. at 13. This determination was reasonable. Under Michigan law, the standard for granting a motion for directed verdict mirrors the *Jackson v. Virginia* sufficiency of the evidence inquiry–that is, whether viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *See People v. Lemmon*, 456 Mich. 625, 634, 576 N.W.2d 129, 133 (1998); *People v. Bowyer*, 108 Mich. App. 517, 520, 310 N.W.2d 445, 446 (1981). As explained above in connection with petitioner's sufficiency of the evidence claim, the evidence presented by the prosecution was sufficient to establish petitioner's guilt beyond a reasonable doubt on the second degree murder charge. Thus, any motion for directed verdict would have been futile, and counsel was not ineffective for failing to make such a motion.

To the extent petitioner claims counsel was ineffective for failing to move for a directed verdict on the first degree murder charge, petitioner cannot show that he was prejudiced. First, petitioner was acquitted of this charge. Second, in any event, the prosecution presented sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that petitioner premeditated the killing of the victim. The same evidence which provided circumstantial evidence of petitioner's involvement in the killing provided circumstantial evidence of petitioner's planning and deliberation. There was evidence presented of an existing motive for the murder. The evidence also showed, when viewed in the light most favorable to the prosecution, that petitioner arrived at the victim's house and drove off with him alone, and that after the murder petitioner tried to cover up the crime by making false statements about his whereabouts and by attempting to dispose of the body. This evidence provided sufficient circumstantial evidence of petitioner's premeditation that a motion for directed verdict on the first degree murder charge would have been denied. Thus, petitioner is not entitled to habeas relief on this ineffective assistance of counsel claim.

50

Finally, petitioner contends that counsel was ineffective for failing to object to the trial court's upward departure from the sentencing guidelines. At the outset, it does not appear that this claim is properly exhausted. In his initial appeal, petitioner did not assert counsel was ineffective at sentencing in connection with his ineffective assistance of counsel claim asserted as Claim VIII in that brief. *See* Def.-Appellant's Br. on Appeal, in *People v. Abby*, No. 262365 (Mich. Ct. App.), at 38-41. Petitioner did, as part of his *Apprendi* claim asserted in Claim XI of the brief, assert that counsel's assent to the scoring of the sentencing guidelines was ineffective, but he did not separately assert that counsel was ineffective for failing to object to the trial court's upward departure. *See id*. at 44. And in Claim XII, which directly challenged the trial court's upward departure, petitioner did not relatedly claim that counsel was ineffective in connection with the upward departure issue. *See id*. at 45-48. More fundamentally, even if petitioner had alleged that counsel was ineffective for failing to object to the upward departure at the original sentencing, what occurred at the original sentencing is irrelevant. Petitioner was granted a new sentencing proceeding, and it is pursuant to the sentence imposed at that proceeding that petitioner is currently incarcerated. Thus, as explained in connection with petitioner's choice of counsel claim, petitioner's entitlement to relief depends on the ineffectiveness of his counsel at resentencing proceeding. And in challenging the resentencing, petitioner never alleged in state court that counsel was ineffective for failing to object to the trial court's upward departure. And even if he did raise such a claim, he did not appeal the court of appeals's decision on the resentencing matter to the Michigan Supreme Court. Because petitioner's challenge to counsel's failure to object to the upward departure was not at all raised in the state courts, and was certainly not raised with respect to the post-resentencing appeal through the Michigan Supreme Court, the claim is unexhausted and the Court may therefore not grant relief on the claim. *See* 28 U.S.C. § 2254(b)(1).

In any event, petitioner's claim is without merit.  *See* 28 U.S.C. § 2254(b)(2) (unexhausted claim may be denied on the merits).  At the resentencing hearing, counsel did argue that the court should sentence petitioner within the guidelines.  After discussing the guidelines scoring, counsel argued that if the court were to find the scoring correct,

> then I believe there's no reason for an upward departure because the statute that covers departures, and I'm talking 769 – MCL 769.34 A B and subsection three, dictates that the reasons for departure must be compelling factors that are not covered in the guidelines – in the guideline scoring.  So if all – all of these points have been assessed against Mr. Abby for predatory conduct, vulnerable victim and so forth are accurate, then – then this guideline range of 162 to 270 months arrived at by the probation agent is correct.  It should be adhered to because all of those factors are taken into consideration in that scoring – in the scoring of those guidelines.

Sentence Tr., dated 6/6/07, at 11-12.  Petitioner, too, argued that the court should stay within the guidelines, pointing to his lack of a criminal record.  *See id*. at 12-13.  The trial judge rejected these arguments and departed upward from the guidelines.  The court described the case as involving "one of the most wicked and vicious and depraved crimes that I've seen committed by one human being on another," *id*. at 19-20, and after setting forth the circumstances of the crime and the proof against petitioner, concluded that "there are substantial and compelling reasons that if not considered in the prior guidelines, certainly were not given sufficient weight going towards the viciousness and depravity as well as taking into account the fact that the victim has still not been found . . . ."  *Id*. at 22.  The court of appeals found no abuse of discretion in this departure.  *See Abby*, 2009 WL 30454, at *2, slip op. at 3.

Thus, contrary to petitioner's argument, his counsel did argue at sentencing that the court should stay within the guidelines range and not upwardly depart from that range.  Petitioner does not suggest any other specific argument counsel should have made.  Nor does petitioner suggest there is a reasonable probability that any further argument from counsel would have resulted in a different

sentence, in light of the trial court's rejection of counsel's argument, its explanation of the reasons for departure, and the court of appeals's conclusion that no abuse of discretion occurred as a result of the departure. Thus, petitioner cannot show that counsel was ineffective, and the Court should conclude that he is not entitled to habeas relief on this claim.

I.     *Recommendation Regarding Certificate of Appealability*

    1.     *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require

53

that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." Fed. R. App. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

Here, if the Court accepts my recommendation the Court should nevertheless grant a certificate of appealability with respect to petitioner's claim that he was denied counsel of his choice at trial. Although I conclude that petitioner is not entitled to habeas relief on this claim, the resolution of this claim is reasonably debatable. The Supreme Court has emphasized the importance of the Sixth Amendment right to counsel of one's choice, and there is a dearth of recent federal caselaw addressing the circumstances present here. Thus, the Court should conclude that petitioner is entitled to a certificate of appealability with respect to this claim.

In all other respects, the Court should deny petitioner a certificate of appealability, for the reasons explained above. In light of the direct evidence tying petitioner to the disposal of the body

54

and the circumstantial evidence placing petitioner in the victim's presence shortly before his death, the evidence was clearly sufficient to support a finding beyond a reasonable doubt that petitioner murdered the victim. Thus, the resolution of this claim is not reasonably debatable. Further, petitioner's hearsay, *corpus delicti*, and other acts evidence claims raise state law claims not cognizable on habeas review, and thus the resolution of these claims is not reasonably debatable. The resolution of petitioner's hearsay-related confrontation claim is not reasonably debatable, because it is clear that the hearsay statements admitted at trial were not "testimonial" under *Crawford*. Similar to petitioner's evidentiary claims, the resolution of petitioner's instructional error claims is not reasonably debatable because those instructions were proper as a matter of state law. The resolution of petitioner's claim that he was denied counsel of his choice at sentencing is not reasonably debatable, in light of the fact that petitioner was given a new sentencing hearing at which he was represented by new counsel. Finally, the resolution of petitioner's prosecutorial misconduct and ineffective assistance of counsel claims is not reasonably debatable, for the reasons explained in connection with the discussion of the merits of those claims. Accordingly, the Court should grant a certificate of appealability with respect to petitioner's claim alleging denial of counsel of his choice at trial, but should deny a certificate of appealability in all other respects.

J.     *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should grant petitioner a certificate of appealability, limited to his claim that he was denied his right to counsel of his choice at trial.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                    s/Paul J. Komives
                                    PAUL J. KOMIVES
                                    UNITED STATES MAGISTRATE JUDGE

Dated: 4/21/11


┌─────────────────────────────────────────────┐
│ The undersigned certifies that a copy of the foregoing
│ order was served on the attorneys of record and  by
│ electronic means or U.S. Mail on April 21, 2011.
│
│                         s/Eddrey Butts
│                         Case Manager
└─────────────────────────────────────────────┘

56